(78 South. 79)

GREIL et al. v. STOLLENWERCK et al.

(3 Div. 310.)

(Supreme Court of Alabama. Feb. 14, 1918.)

1. MUNICIPAL CORPORATIONS ⊘671(5) — ENJOINING CLOSING OF STREET — ABUTTING OWNERS.

Complainants owning property abutting that portion of a public street which defendants are threatening to close are within the class of citizens who may maintain suit to enjoin the closing; their injury being different in kind from that suffered by the public.

2. RAILROADS ⊘77—CONTRACT WITH MUNICIPALITY—RIGHT TO CLOSE PRIVATE STREET.

Where a public service company and a municipal corporation agreed that certain public streets should be used exclusively by the company, and that in lieu thereof the company should maintain on its lands certain other streets designated as private streets, which contract has been ratified by the Legislature, a street so designated is subject to use by the public as other streets, so that neither the company nor its successor can close it or prevent abutting owners from using it after use by the public as other streets of the city for many years; the use of the words "private street" not making the street in question private to be abandoned or closed at will.

3. CONTRACTS ⊘153 — CONSTRUING AS A WHOLE.

A contract must be construed as a whole, and not merely by considering one or more paragraphs or sentences alone.

4. MUNICIPAL CORPORATIONS ⊘684 — CONTRACT FOR USE OF STREETS—CONSTRUCTION.

A contract between a city and a public service corporation giving the latter the right to close certain streets, but obligating it to maintain others, must be construed in the light of its history, a part of which has become a matter of record both judicial and legislative.

5. MUNICIPAL CORPORATIONS ⊘684 — CONTRACT FOR USE OF STREETS—CONSTRUCTION.

In construing municipal ordinances and contracts giving public service corporation a right to close certain streets, but obligating it to maintain others, the rule is universal to interpret all ambiguous language in favor of the public.

Appeal from Circuit Court, Montgomery County; Gaston Gunter, Judge.

Bill by N. J. Greil and others against Frank Stollenwerck and others to enjoin the obstruction of a way. From a decree sustaining demurrers to the bill and dismissing it, complainants appeal. Reversed, rendered, and remanded.

The following is the ordinance and contract referred to and directed to be set out:

An Ordinance.

Be it ordained by the city council of Montgomery as follows:

Section 1. That the city council of Montgomery hereby agrees to all terms, conditions and stipulations of the following contract between the Mobile & Montgomery Railway Company, and the Louisville & Nashville Railroad Company, and the city council of Montgomery, and the mayor of the city of Montgomery is hereby authorized, empowered and instructed to execute the same for and on behalf of the city council of Montgomery, to wit:

"State of Alabama, Montgomery County.

"This contract made and entered into on this, the —— day of ——, 1896, by and between the Mobile & Montgomery Railway, a body corporate under the laws of the state of Kentucky, and the city council of Montgomery, witnesseth:

"That in consideration of the covenants and agreements on the part of the city council of Montgomery, as hereinafter stipulated, the Mobile & Montgomery Railway Company, for itself, its successors and assigns, agrees:

"First. To build a freight station in said city of Montgomery as shown by general plan hereto attached, marked Exhibit A, and made a part thereof, said freight station to be fifty (50) feet wide, not less than five hundred and thirty-five (535) feet in length, two (2) stories high, extending from an alleyway in the rear of the Windsor Hotel, not less than five hundred and thirty-five (535) feet in a southwesterly direction, across what would be a continuation of Lee street to the present north end of Moulton street.

"Second. The Mobile & Montgomery Railway Company, for itself, its successors and assigns, also agrees to build a passenger station three hundred and nine (309) feet in length, with general waiting room, ladies' waiting room, colored waiting room, all the necessary ticket offices, toilet rooms, lunch rooms, dining room; also baggagerooms, mail and express rooms, and a train shed in Water street between Commerce street and Moulton street six hundred (600) feet long, with all necessary inclosures, tracks, etc., as per plat hereto attached, marked Exhibit A, all of said buildings to be constructed of brick, stone and iron, or either of said materials.

"Third. The Mobile & Montgomery Railway Company, for itself, its successors and assigns, also agrees to build and maintain an underpass twenty-four (24) feet wide in Commerce street passing under the proposed tracks crossing Commerce street to reach the wharf at the foot of Commerce street, as indicated by general plan hereto attached marked Exhibit A, but the said Mobile & Montgomery Railway Company, its successors and assigns, shall not be required to maintain the street leading through said underpass after the same has been constructed. It also agrees to build a substantial bridge across said underpass, not less than thirty feet in width immediately east of the fence proposed to be constructed across said Commerce street, as shown by plat hereto attached and marked Exhibit A, but it shall not be required to maintain said bridge after it has been so constructed; it also agrees to protect said underpass on each side by the erection of a neat and substantial iron railing or fence.

"[Counts 4 and 5 appear in the opinion.]

"In consideration of all of which the city council of Montgomery hereby agrees with the said Mobile & Montgomery Railway Company, its successors and assigns:

---

⊘For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

"(a) That said buildings, underpass, and inclosure may be so constructed as herein provided for, and that Moulton street and Lee street shall terminate at the points where the same now intersect with the property of the Mobile & Montgomery Railway Company, and that parts of the said streets now extending beyond where the same so intersect said property shall be discontinued and abolished as streets or any part thereof as indicated by said plat, marked Exhibit A, upon the execution of these presents.

"(b) That said city council of Montgomery agrees that a fence may be constructed on the line of Water street on each side so that said fence shall cross Commerce street on each side of Water street as indicated by plat hereto attached, marked Exhibit A, and that after the construction of the underpass and the stations herein provided for there shall be no more crossing of the railroad tracks laid across Commerce street at grade, but that all crossings shall be made entirely by means of and through said underpass, and the said city council of Montgomery obligates and binds itself to pay all costs and damages to all abutting properties and to hold the said Mobile & Montgomery Railway, its successors and assigns, harmless against any liability whatever for damages on account of the construction of said underpass.

"(c) The said city council of Montgomery further obligates and binds itself to pass all laws and ordinances necessary for the protection of the Mobile & Montgomery Railway, its successors and assigns, in the use and enjoyment of said property and privileges.

"The Louisville & Nashville Railroad Company as lessee of the Mobile & Montgomery Railway Company, joins in this contract for the purpose of consenting, and it does hereby consent, to all the terms, stipulations, and conditions of the same.

"In witness whereof the Mobile & Montgomery Railway Company and the Louisville & Nashville Railroad Company have caused these presents to be executed by their respective presidents and their respective corporate seals to be hereto affixed, and the said city council of Montgomery has caused these presents to be executed by John H. Clisby, as mayor of the city of Montgomery, and its corporate seal to be hereto affixed by R. B. Snodgrass, on this the —— day of ——, 1896."

Adopted June 9, 1896.
Approved June 18, 1896.
                    John H. Clisby, Mayor.

Steiner, Crum & Weil, of Montgomery, for appellants. Ball & Samford and Goodwyn & McIntyre, all of Montgomery, for appellees.

MAYFIELD, J. Appellants filed this bill against appellees, seeking to enjoin the respondents from closing or obstructing a portion of a street or alley within the corporate limits of the city of Montgomery, Ala.

[1] Appellants, complainants below, allege that they own property abutting that portion of the street or alley which is obstructed or inclosed, or threatened to be so obstructed or inclosed. The bill therefore brings appellants within the class of citizens who may maintain a private suit to enjoin or abate a public nuisance; that is, they show an injury or detriment different in kind from that suffered by the public, in that their ingress and egress to and from the obstructed street or alley is impaired or destroyed.

The existence of a permanent obstruction in a highway is such an unlawful act as injures the owners of adjoining lots, and who have a right as an incident to the enjoyment of their property to have the street maintained in its full width, free from obstructions of a permanent character; this is a right that may be vindicated by injunction or by indictment. First National Bank of Montgomery v. Tyson, 144 Ala. 457, 39 South. 560.

The obstruction of a public highway or a public street or alley is a nuisance which a court of equity will enjoin at the suit of an individual who suffers injury, on account of such obstruction, different in degree and character from that of the public. Cochran v. Purser, 152 Ala. 354, 44 South. 579; Demopolis v. Webb, 87 Ala. 659, 6 South. 408; Bank v. Tyson, 133 Ala. 459, 32 South. 144, 59 L. R. A. 399, 91 Am. St. Rep. 46; Id., 144 Ala. 457, 39 South. 560.

[2] The respondents both answered and demurred to the bill. The bill and answer, considered together, show that the real, the disputed, question is whether or not the way or alley in question is a public one, or merely a private way, which appellees and their predecessors in title created, and have the right to abandon or obstruct when the use or necessity for which it was created has ceased. This question in large measure depends upon the proper construction of a contract made between the city of Montgomery and the Mobile & Montgomery Railway Company, a public service corporation, appellees' predecessor in title, more than 20 years ago. This contract is by exhibit and reference made a part of both the bill and the answer. The reporter will set out the contract in full, that the questions and the decision and opinion may be the better and more easily understood.

It will be seen that by virtue of this contract the railroad company, public service corporation, acquired the right to use certain parts and portions of certain streets in the city of Montgomery for the location of its tracks, depots, bridges, etc. Some of the uses involved the obstruction of parts of the public streets and their exclusive appropriation to the necessities of the railway. The freight depot was to be built, and was built, across one of the public streets which led directly to the railway passenger depot; and the right to use another street for its tracks and passenger sheds, so as to give it nearly, if not quite, the exclusive use of such street, was also acquired by the railway company.

In consideration of these rights acquired to use the public streets, the railway company, for itself and its successors, agreed to build freight and passenger depots of certain dimensions and fitness, between, along, and across certain streets; to construct an underpass along one of the public streets, under its tracks, to the river or wharf, and to construct a bridge across this underpass, but not to maintain the underpass or the bridge after it was constructed; to build car sheds over its tracks along another street, and, in addition, to open up and construct certain streets,

ways, or alleys on its own land, and maintain the same. These streets, alleys, or ways so agreed to be constructed and maintained constituted almost, if not quite, the only means of ingress and egress the public had to its depots which the railway agreed to construct. These streets, alleys, or ways agreed to be constructed and maintained, and which were so constructed, and were so maintained for a long time, are in the contract denominated "private streets." Nothing specific, however, is said in the contract, as to the right of the railway company, or of its successors in title, to change or abandon the streets at pleasure, or upon the happening of stated contingencies. If the bill had merely alleged in terms that the obstructed street, way, or alley in question was a public street or highway, it would unquestionably have contained equity, and would not have been subject to demurrer on the ground now under consideration. The averment, however, was more specific, and referred to the contract in question, being in part as follows:

"Complainants further show · that the said street, so constructed by the said Mobile & Montgomery Railway Company, pursuant to the fourth paragraph of said contract contained in the said ordinance attached hereto as Exhibit A, did become, upon the construction thereof as provided in said contract, a public thoroughfare for the use of the public generally in the city of Montgomery, and that the making of said contract by the city council of Montgomery was an acceptance by the said city of Montgomery of said street, when so constructed, as a public thoroughfare or street, etc."

The fourth paragraph of the contract above referred to reads as follows:

"Fourth. Said Mobile & Montgomery Railway, for itself, its successors and assigns, also agrees to construct and maintain at its own expense on its own property a private street not less than thirty-five (35) feet in width, leading from a thirty (30) foot alley in the rear of the Windsor Hotel along the front of said freight station to Moulton street, as shown by plat hereto attached, marked Exhibit A."

The fifth paragraph of this contract reads as follows:

"Fifth. The Mobile & Montgomery Railway Company, for itself, its successors and assigns, also agrees to maintain a private street not less than thirty-five (35) feet in width on its own property, leading from Commerce street along the front of said passenger station as shown by plat hereto attached, marked Exhibit A, and to build and maintain a fence inclosing the passenger tracks leading into said union passenger station, said inclosure commencing on a line. with the west side of Coosa street, and extending in a southwesterly direction to the intersection of Whitman street, as shown by plat hereto attached, marked Exhibit A, and to arrange the freight tracks so that the same shall not be laid between the car shed herein provided for, and the Alabama river outside of said improvements shall be bona fide commenced within three months after the passage of this ordinance and be pushed to a completion as rapidly as practicable."

[3] The contract, of course, must be construed as a whole, and not merely by considering one or more paragraphs or sentences alone. This is necessary to arrive at the true 201 ALA.—20

meaning intended to be recorded by the parties to the contract. A part of this contract, that authorizing the railway to permanently obstruct Lee street by building the freight depot across it, was held void because it was beyond the power of the city to so authorize the obstruction of its streets; but the contract was, subsequent to its making, ratified and confirmed by an act of the Legislature, and, as so ratified and confirmed, was upheld as valid by this court, on appeal, at the suit of the Attorney General against the Louisville & Nashville Railroad Company (158 Ala. 218, 48 South. 391). It was there decided that the contract in question was so far ratified and confirmed by the Legislature as to authorize the obstruction of Lee street by the building of a freight depot across it. As a part of this same contract the railway company, for itself and its successors in title, agreed to open certain streets, including the one in question, and to maintain the same. These streets so agreed to be opened and maintained were necessary, if not the sole, approaches to the freight and passenger stations agreed to be erected· and maintained. It is true that these streets are in the contract denominated "private streets." Did this make them private ways, to be abandoned or closed at the will of one of the parties to the contract?

[4] This contract must be construed in the light of its history, a part of which has become matter of record, both judicial and legislative, in this state. The contract and its history show that the railway company, a public service corporation, and the municipal corporation, which, of course, was acting for and on behalf of the local public, were desirous of erecting and maintaining adequate depot, trackage, and approach facilities, for the use and convenience of both the railway company and the public, within the city of Montgomery. To accomplish this end, it was covenanted and agreed between the contracting corporations that certain public streets, then approaches to the depots and tracks of the railway company in the city, or portions of such streets, should be used exclusively by the railway company for depots, trackage, and shed facilities, and, in lieu thereof, that the railway company should construct and maintain certain other streets and approaches for traffic and travel to and from the depots to be erected and maintained. These streets are, however, as before said, in the contract denominated "private streets." It is alleged that ever since the other streets were closed, and the latter opened, the last have been used by the public as all other streets in the city are used, notwithstanding they are maintained by the railway company, and not by the city.

Some years ago, by contract with abutting owners on Lee street, the railway company or its successors in title removed that part of its freight depot which abutted Lee street, and abandoned that portion thereof which lay

east of that street, and in lieu thereof, by exchange with such abutting owners, acquired other property on the west side of Lee street adjoining or near to the remaining part of its freight depot, situate west of Lee street, which other property it thereafter used to supplement its freight depot facilities. In doing all this the railway company, of course, abandoned that part of the street which it had theretofore opened up and maintained east of Lee street and leading to Gilmer street, which is the part now in controversy.

The railway company also insists that neither the public nor the abutting owners on this part of the street have any right to use or easement in, to, or over, that part of the street, that when it ceased to use the land east of Lee street for a depot there was no necessity for a street or easement there, and that it or its successors in title have the right to close it up and prevent its use by the public or by the abutting owners.

On the other hand, these appellants (complainants below), who are abutting owners on that part of the street so abandoned and closed, claim that the part of such street in question became a public highway, by virtue of the contract and of the use to which for many years it was put, notwithstanding it was in the contract denominated a "private street."

The phrase in the contract "private street" is a paradox, if not an absurdity or inconsistency, in the use of speech or words. Literally and strictly speaking, there is and can be no such thing as a private street. There are and may be both public and private ways, but not so as to streets. Streets are a certain class of public highways; a public street, literally speaking, means no more than a street; while a private street, literally speaking, is an impossibility. No way can be both private, and a street; it may be one or the other, but not both. Prof. Elliott says:

"A street is a road or public way in a city, town, or village."

He further says that:

"A way over land set apart for public travel in a town or city is a street, no matter by what name it may be called; it is the purpose for which it was laid out and the use made of it that determines its character." Elliott on Streets, § 19.

The New York court has held that the words, "street," "avenue," or "highway," imply a way of a public character and nature, and no other way whatsoever. In re New York Cent. & H. R. R. Co., 200 N. Y. 123, 93 N. E. 515. Mr. McQuillin (Munic. Corp.) likewise defines "streets."

In construing this contract we must therefore determine whether or not a private way or street was to be constructed and maintained by the railway company. If a private way only, then, of course, there is no equity in this bill; if a street, then the bill does contain equity. Construing the contract as a whole, and in the light of its history, and of the uses to which the way was intended to be put, and was put, by the parties and the public for this long period, we are constrained to hold that the way is a street, and not a private way.

[5] In construing municipal ordinances and contracts like the one in question, the rule is universal to interpret all ambiguous provisions in favor of the public. Birmingham Waterworks Co. v. Hernandez, 196 Ala. 438, 71 South. 443, L. R. A. 1916E, 258. The court will also put that interpretation on the contract which the parties and the public have for a long time placed upon it; that is, that the way was and is a street. Bixby-Theisen Co. v. Evans, 174 Ala. 571, 57 South. 39; Greenville v. Greenville, 125 Ala. 625, 27 South. 764. An owner, of course, may annex conditions to his grant of an easement; but they cannot be such as to defeat the grant or easement.

Mr. Elliott (Roads and Streets, vol. 1, § 163) thus declares the rule:

"An owner may grant whatever estate he sees fit, and may annex conditions and limitations to his grant at his pleasure, provided that such limitations and conditions are not inconsistent with the dedication and will not defeat the operation of the grant. A condition or limitation which would render the dedication ineffectual cannot be annexed; thus a man cannot reserve possession to himself, nor reserve a right to do anything in the way which will destroy its character as a public way. Nor can there be a valid dedication to a part only of the public, since this would be repugnant to the purpose of the dedication, and by limiting the right to use the way to designated individuals or classes of persons the general public would be excluded, and this would render it impossible for the public to complete the dedication by an acceptance. The donor cannot, as we have already seen, annex to the dedication a condition that the way shall be under the control of other public or corporate officers than those invested by law with the government of the local territory within which the ways are situated, nor can he, as a rule at least, annex any condition which will have the effect to take from the proper local authorities the power to improve the way in the same mode as other public ways of the locality are improved. Thus a condition in a deed of land sold a city for a street providing that, as a part of the consideration, the grantor and the remaining portions of the lot should not be charged with any costs connected with the extension or maintenance of the street, is void. In such cases the general rule is that the condition will fall and the grant stand. Subject to the limitations we have stated, the dedication must, as the law phrase runs, be accepted secundum formam doni. It is stated in general terms in some of the cases that there may be a partial acceptance, but it seems to us that this doctrine must be taken with some qualification. If the donor should consent that the public might accept part and reject part, then, doubtless, the acceptance, if for the public generally, would be valid; but if he should insist on a full acceptance, we think that on principle he would be sustained by the courts since to hold otherwise would be in effect to compel him to part with his property on terms different from those prescribed in his grant. It is easy to conceive instances in which the landowner would be benefited by an acceptance of the dedication as proposed, but not benefited if it were limited or accepted only partially."

The contract here does not in terms fix any conditions or limitations upon the use of the streets, either as to character of use, or the time of the use; nor does it provide for abandonment, forfeiture, or reclaim, upon any conditions. The sole qualification, limitation, or condition is the denomination of the streets to be established and maintained by the railway company, "private streets," which confuses, rather than explains, the easements. If they were intended by the parties to the contract as mere approaches, or ways, to the depots, would they not have been so called or denominated? The railway company needed no authority from the city to construct or maintain such ways or approaches. If the ways were purely private as to the railway company, and could be abandoned in whole or in part at the pleasure of the company, why should it covenant with the city to open and maintain? Did the city or the public acquire no right to enforce this covenant? Did the Legislature so understand the contract, when it ratified it, and authorized the closing up of nearly every, if not quite every, approach to the depots agreed to be constructed, and which were then constructed? Would the Legislature have ratified this contract, if that body had construed it to authorize the railway company to close all these streets which in the contract it had agreed to open and maintain in lieu of those closed and occupied with the company's depots, tracks, and sheds?

To construe the contract as providing for a purely private way would authorize the railway company or its successors in title and right to close all permanent streets which lead to its depots. The mere fact that the company has since opened up Lee street by removing its freight depot from across it does not change the proper construction of the contract. If it can now close up these streets in question, it can, so far as the city and the public are concerned, close Lee street again. The company is by this very contract expressly authorized, if not required, to close Lee street, and the Legislature has ratified the contract. In reclosing Lee street it might violate its contracts with appellees and other private citizens, but not any with the municipality or the public, nor the one ratified by the Legislature. The language of the Supreme Court of New York is apt here:

"It is beyond controversy that this strip of land was to be left open and vacant for the use of the owners and occupants of the adjoining lots, for all the purposes of a street; and there is nothing to indicate that the plaintiff entertained any other or different purpose. Then, to adopt the language of Mr. Justice Mason, in Bissell's Case, 'as between these parties, grantors and grantees, it is a public street to all intents and purposes, except that the public authorities are not bound to keep it in repair.'" Perrin v. Railroad Co., 36 N. Y. 123.

It may be said that the fact that the railway company could, under this construction of the contract, at its pleasure close up or abandon all the ways to its depot, would not permanently prevent the city or the public from access thereto, should the attempt be made, because the Legislature, or the Public Service Commission acting under the authority of the Legislature, could compel the railway company to provide adequate facilities as to ways or approaches to its depots. This, of course is true; but the answer is that the Legislature have already passed upon this identical contract, and approved the ways now provided in lieu of those theretofore provided by the city. Can we say or know that the Legislature would have ratified this contract if they had construed it as appellees would have us to construe it? It is not reasonable to suppose that the city would have authorized the permanent closing up of all streets leading to the depots, unless some other streets were provided in lieu thereof. The bill alleges that the streets in question have always been used and treated by the public as all other streets in the city, and that this use had continued through a period of many years.

There is this strong reason leading to the conclusion that the streets in question were not intended as mere private ways. They were by the contract, and its ratification by the Legislature, made as substitutes for, or to stand in lieu of, other streets or portions of streets which were closed and used by the railway company. It is perfectly reasonable to assume that it was intended that the substituted ways should be of the same nature and character, and should be put to the same uses, as those which were closed up and used exclusively by the railway company. It was reasonable, moreover, that the railway company should furnish, open, and maintain the substituted ways, as it was allowed to take and use others already furnished by the city to the public. As the old were taken and used exclusively for the benefit of the railway company, it was not improper or unreasonable that it should furnish and maintain substitutes therefor.

Mr. Jones (Easements, § 429) thus states the rule:

" 'Without yielding the doctrine that the public cannot be ousted of its right by adverse possession, it is not at all inconsistent to hold that under a new dedication another way equally convenient has been substituted by general and long-continued acquiescence for the original way. The right of the public to a highway, without substantial detriment, is preserved, while its particular location may have been varied by common consent. The old right is not extinguished, although its exercise may be transferred to the new way. Judge Dillon puts it upon the ground of an estoppel in pais, but the principle of substitution appears to us to be a stronger ground.' "

A new way may be substituted for an old one, and dedication and acceptance may be shown by use or by the circumstances of the case. In case of such a substitution the rights of the public ought to be preserved, and their right to use the original ought not

to be taken unless an equal and full right is given to use the one substituted. The contract in question, with its ratification by the Legislature, ought not to be so construed as to deprive the public of the right to use the substituted way as they did the original, which was taken from them, unless that construction is necessary and irresistible.

It follows from what we have said that we hold that the way in question is a street, and as such subject to the right of use by the public as other streets in the city, notwithstanding it is called a private street in the contract. This being true, appellees (respondents below) have no right to close it, or to prevent the appellants as abutting owners from using it, and appellants' bill to enjoin such obstruction and closing of the street in question contains equity, and the trial court erred in sustaining the demurrer to the bill for want of equity. The decree below will be reversed; and a decree will be here rendered overruling the dmurrer to the bill.

Reversed, rendered, and remanded.