MURDOCK, Justice.
 

 Shirley Shepard Chalkley appeals from a summary judgment entered in favor of the Tuscaloosa County Commission (“the Commission”) on her complaint seeking a declaratory judgment, injunctive relief, and damages related to Tuscaloosa County’s refusal to maintain a storm sewer that runs underneath her property. We affirm the judgment of the trial court.
 

 I. Facts and Procedural History
 

 The parties agree that, for the purposes of this appeal, the facts are undisputed. Chalkley is the owner of an interest in lot 98 of the Mallard Creek subdivision (“the subdivision”), located in an unincorporated area of Tuscaloosa County (“the County”). The plat of the subdivision was approved by the County engineer on September 28, 1987, and was filed for record on November 2, 1987. A note on the plat provided:
 

 “All easements on this plat are for public utilities, sanitary sewers, storm sewers, and storm ditches, and may be used for such purposes to serve property both within and without this subdivision. No permanent structure or other obstruction shall be located within the limits of a designated easement.”
 

 A 20-foot-wide drainage easement designated in the plat extends across lot 98 and also across lots 97, 99, 100, and 101. A concrete storm sewer was installed in the drainage easement by the developer of the subdivision. The storm sewer runs through a part of lot 98.
 

 On February 24, 1993, the Commission adopted a resolution that provided, in pertinent part:
 

 “1. That the County accept the streets, together with drainage structures in, and which are a part of, said streets which are located in dedicated street rights-of-way, for maintenance by the Tuscaloosa County Commission. The drainage structures described herein are those structures which are a part of or are located in the streets (curbs and gutter, catch basins, flumes and pipes) and does not include any natural waterway which drains surface water in the area.”
 

 The parties agree that on the face of the resolution the Commission accepted for maintenance only those parts of the storm-
 
 *670
 
 drainage system that are located within the street rights-of-way in the subdivision.
 

 A large sinkhole developed in Chalkley’s property, which Chalkley alleges was cased by the failure of the storm drain running underneath the property. Chalk-ley notified the County of the problem, but it declined to investigate or to repair the damaged storm drain on the basis that the County did not accept the responsibility for maintaining the parts of the storm drain located on private property.
 

 Chalkley subsequently sued the Commission, alleging that the failure of the storm drain created a dangerous condition on her property and asking that the trial court declare that the County was responsible for repairing the storm drain and for damage to her property. The Commission filed a motion for a summary judgment on the basis of the February 24, 1993, resolution; Chalkley opposed the motion.
 

 On February 25, 2008, the trial court entered a summary judgment in favor of the Commission and against Chalkley, concluding that Chalkley’s request that the trial court find “as a matter of ‘public policy ” that the County should be responsible for maintenance of the entire storm-drainage system was a decision that “requires fact-finding and an analysis of the costs/benefits to the public that is appropriately made, under our system, by the legislative branch.” The trial court reasoned that
 

 “[ajdopting Ms. Chalkley’s argument in this case would mean that a court, based on its own policy considerations of what is in the best interest of the public, would require a legislative entity to acquire responsibility and liability for structures under private land. It may well be wise, expedient, and appropriate to require entire subdivision drainage systems to be under the control of the approving governmental entity, but that is a decision to be made by the County, not the judiciary. Therefore, judgment is entered in favor of [the Commission].”
 

 II. Standard of Review
 

 “An order granting or denying a summary judgment is reviewed de novo, applying the same standard as the trial court applied.
 
 American Gen. Life & Accident Ins. Co. v. Underwood,
 
 886 So.2d 807, 811 (Ala.2004).... Where, as here, the facts of a case are essentially undisputed, this Court must determine whether the trial court misapplied the law to the undisputed facts, applying a de novo standard of review.
 
 Carter v. City of Haleyville,
 
 669 So.2d 812, 815 (Ala.1995).”
 

 Continental Nat’l Indem. Co. v. Fields,
 
 926 So.2d 1033, 1034-35 (Ala.2005).
 

 III. Analysis
 

 Chalkley contends that the storm-drainage system was installed when the subdivision was built and that it should be viewed as a single, continuous structure for public benefit. She argues that because the storm-drainage system is one structure, the Commission, as a matter of public policy, should not be allowed to accept responsibility for parts of the system rather than the system as a whole. Chalkley contends that the law and existing precedent require this result.
 

 Specifically, Chalkley first argues that the County is the proprietor of a “dominant tenement” in relation to the easement that runs through her property and that, therefore, the County has the duty to maintain and to repair the drainage system built on the easement. In support of this proposition, Chalkley cites
 
 Mountain Brook Estates, Inc. v. Solomon,
 
 247 Ala. 157, 23 So.2d 1 (1945), and, specifically, a portion of that opinion in which the Court stated:
 

 
 *671
 
 “The duty to maintain and repair, if it exists at all, arises out of proprietorship of the dominant estate, and its appurtenances, and where the easement exists for the sole benefit, use and enjoyment by the proprietor of the dominant estate, the proprietor of such estate ordinarily is hable for the cost of maintenance and repair.”
 

 247 Ala. at 162, 23 So.2d at 4.
 

 In
 
 Solomon,
 
 Mountain Brook Estates, Inc. (“the developer”), at one time owned all the property upon which the Mountain Brook Estates subdivision was built. The developer divided the property into lots for the purpose of building residential estates and selling them for a profit. Pursuant to this goal, the developer built a drainage ditch across the entire property and reserved an easement on each lot on which the drainage ditch was located. The developer then sold the lots, eventually selling one to David Solomon 13 years after the drainage ditch had been installed. When water from the drainage ditch backed up on Solomon’s property, he filed an action for injunctive relief against the developer, contending that the drainage ditch was inadequate for draining the amount of water the area received and asking the trial court to order the developer to repair the drainage ditch.
 

 This Court, in the course of explaining the law of easements, stated the above-quoted rule concerning the responsibility of the dominant estate of an easement. The Court went on to explain, however:
 

 “It is very clear from the facts alleged in the bill that the easement and drainage ditch did not exist solely for the benefit of the dominant estates, but it was created and established as well to preserve the property which the complainant purchased, and upon which he erected his home. But for said ditch, the property purchased and owned by [Solomon] would have suffered the ravages of the drainage system [from higher elevation lots]. When [Mountain Brook Estates, Inc.,] sold and conveyed all of said dominant estates in the sector, it ceased to be the proprietor of said dominant estates, and the responsibility of repair and maintenance, if it ever existed, passed to the grantees or ceased to exist.”
 

 247 Ala. at 162, 23 So.2d at 4-5.
 

 Thus,
 
 Solomon
 
 itself explains why Chalkley’s argument that the County holds a dominant estate that would make it responsible for maintaining and repairing the storm-drainage system fails. First, it is debatable that a “dominant estate” exists in the situation presented here. Further, there is no doubt that the easement does not exist “solely” for the benefit of the County; it clearly benefits Chalkley and every other owner of a lot in the subdivision. Consequently, the duty to maintain and repair the storm-drainage system does not fall upon the County merely because the County also benefits from the easement.
 

 Chalkley also contends that this Court’s precedent supports the idea that the County cannot accept only in part a dedication of property for public use and that, if the County accepted part of the property, it must be said to have constructively accepted the responsibility for the whole of the property.
 
 [1]
 
 In so arguing, Chalkley misreads our cases.
 

 Chalkley is correct that the approval of the subdivision plat by the County engineer, along with the notation in the plat stating that “[a]ll easements on this
 
 *672
 
 plat are for public utilities, sanitary sewers, and storm ditches, and may be used for such purposes to serve property both within and without the subdivision,” constituted a dedication of property for public use. See, e.g.,
 
 Montabano v. City of Mountain Brook,
 
 653 So.2d 947, 949 (Ala.1995) (noting that “[t]he recording of a plat or map ... constitutes a valid dedication to the public of all public places designated in the plat or map”). “A ‘dedication’ is a donation or appropriation of property to the public use by the owner.”
 
 City of Fairfield v. Jemison,
 
 283 Ala. 462, 464, 218 So.2d 273, 275 (1969).
 

 It also is true that a grantor is limited in the types of restrictions that can be placed on a dedication of property for public use.
 

 “ ‘An owner may grant whatever estate he sees fít, and may annex conditions and limitations to his grant at his pleasure, provided that such limitations and conditions are not inconsistent with the dedication and will not defeat the operation of the grant. A condition or limitation which would render the dedication ineffectual cannot be annexed; thus a man cannot reserve possession to himself, nor reserve a right to do anything in the way which will destroy its character as a public way.’ ”
 

 Greil v. Stollenwerck,
 
 201 Ala. 303, 306, 78 So. 79, 82 (1918) (quoting 1 Elliott,
 
 Roads and Streets
 
 § 163).
 

 The acceptance of the dedication is equally as important as the dedication, however. “ ‘ “The acceptance of a dedication, or what may be more accurately called an offer of dedication, has many of the incidents of the acceptance of a contract and of a deed, and is what makes the dedication complete.” ’ ”
 
 Vestavia Hills Bd. of Educ. v. Utz,
 
 530 So.2d 1378, 1383 (Ala.1988) (quoting the trial court’s order, quoting in turn 23 Am.Jur.2d
 
 Dedication
 
 § 41 (1983)). Similar to a contract, “ ‘the language set forth in the deed [or plat] is considered merely an offer of dedication by the grantors until such time as the dedication has been accepted by the grantee.’ ”
 
 Id.
 

 In
 
 Ivey v. City of Birmingham,
 
 190 Ala. 196, 204, 67 So. 506, 509 (1914), this Court considered the issue of the public’s responsibility for the maintenance of a dedicated street.
 
 [2]
 
 The Court in that case held:
 

 “The owner of the property through which this street was originally laid off could not impose his dedication of the street upon the public by platting the territory and disposing of lots according to the plat. He thereby made it a way,
 
 imvocable as to ‘purchasers; but to devolve upon the public the duty of maintaining the way as a public road or street it was necessary that there should be an acceptance
 
 by the public of the dedication.”
 

 (Emphasis added.) The principle recognized in
 
 Ivey,
 
 which has been recognized repeatedly in other jurisdictions, is that because acceptance of a dedication constitutes the assumption of responsibility for
 
 *673
 
 the property in question, a grantor cannot automatically impose such responsibility on the public through his or her dedication of the property. See, e.g.,
 
 Brown v. Moore,
 
 255 Va. 523, 529-30, 500 S.E.2d 797, 800 (1998) (explaining that “[b]ecause a dedication imposes the burden of maintenance and potential tort liability on the public, a dedication is not completed until the public or competent public authority manifests an intent to accept the offer”).
 

 Citing
 
 Ivey,
 
 this Court stated in
 
 Tuxedo Homes, Inc. v. Green,
 
 258 Ala. 494, 497, 63 So.2d 812, 814, (1953):
 

 “It is thoroughly well settled in this State and elsewhere that an owner of land cannot impose his dedication of a street upon the public by platting the tract and disposing of lots according to the plat; and that in order to have a dedication there must be an acceptance of it by the city if the property is located in a city.
 
 Ivey v. City of Birmingham,
 
 190 Ala. 196, 67 So. 506.”
 

 In a case involving land located in Baldwin County, the Court in
 
 Baldwin County Commission v. Jones,
 
 344 So.2d 1200, 1204 (Ala.1977), citing
 
 Tuxedo Homes,
 
 stated that approval of a recorded subdivision plat “does not amount to an acceptance of the roads as public roads.”
 

 In
 
 Blair v. Fullmer,
 
 583 So.2d 1307, 1310 n. 2 (Ala.1991), this Court stated:
 

 “The mere fact of dedication does not necessarily impose upon the county a duty to maintain the road. Cf.
 
 Lybrand v. Town of Pell City,
 
 260 Ala. 534, 538, 71 So.2d 797, 801 (1954), in which it was noted that a dedication of a street in a city ‘does not impose any duty upon the city until it has accepted the dedication.’ ”
 

 Relying on both
 
 Ivey
 
 and
 
 Tuxedo Homes,
 
 the
 
 Blair
 
 Court noted that in the former “the owner, by platting the street and recording the plat, ‘thereby made it a way, irrevocable as to purchasers; but to devolve upon the public the duty of maintaining the way as a public road or street it was necessary that there should be an acceptance by the public of the dedication.’
 
 [Ivey,]
 
 190 Ala. at 204, 67 So. at 509.”
 
 Blair,
 
 583 So.2d at 1311 (noting that principle established in
 
 Ivey
 
 can thus be traced through
 
 Tuxedo Homes
 
 and
 
 Cottage Hill Land Corp. v. City of Mobile,
 
 443 So.2d 1201 (Ala.1983), to
 
 CRW, Inc. v. Twin Lakes Property Owners Association, Inc.,
 
 521 So.2d 939 (Ala.1988)). The
 
 Blair
 
 Court concluded its analysis as follows:
 

 ‘Whatever the effect of
 
 Cottage Hill
 
 and
 
 CRW
 
 on the other cases and the statutes on point, those two cases clearly do not deprive a purchaser of a lot in a subdivision of the right to the roads shown in the subdivision plat.
 
 It is certainly the case that a city or county must accept such a dedication (perhaps by the general public’s use of the
 
 roads)
 
 before there arises a duty on the governing body to maintain the roads,
 
 and it may be that those two cases require an acceptance by a public body before the general public can be given the right to use the roads.”
 
 [3]
 

 583 So.2d at 1311 (emphasis added).
 

 In this case, the developer of the subdivision dedicated all the easements on the
 
 *674
 
 subdivision property — including the easements for the storm-drainage system — for public use. As Chalkley concedes, the Commission accepted only those parts of the storm-drainage system that existed within the street rights-of-way.
 
 [4]
 
 Chalkley cites
 
 Greil
 
 for the proposition that the County could not accept only part of the dedication.
 
 Greil
 
 states, in pertinent part:
 

 “‘[T]he dedication must, as the law phrase runs, be accepted secundum for-mam doni [according to the form of the gift or grant]. It is stated in general terms in some of the cases that there may be a partial acceptance, but it seems to us that this doctrine must be taken with some qualification. If the donor should consent that the public might accept part and reject part, then, doubtless, the acceptance, if for the public generally, would be valid; but if he should insist on a full acceptance, we think that on principle he would be sustained by the courts since to hold otherwise would be in effect to compel him to part with his property on terms different from those prescribed in his grant.’ ”
 

 201 Ala. at 306, 78 So. at 82 (quoting 1 Elliott,
 
 Roads and Streets
 
 § 163).
 

 The above-quoted passage from
 
 Greil
 
 does not help Chalkley, however, because there is no restriction in the developer’s dedication that the County had to accept the entire dedication in order to take control of the property. Indeed, on the facts before us, the grantor did not object to the County’s partial acceptance of the dedicated property. Thus,
 
 Greil
 
 does not indicate that the County was prohibited from accepting the dedication in the manner it chose.
 

 In fact, the law on the subject generally is that “[a]n offer of dedication need not be accepted in its entirety; the property offered for dedication may be accepted in part and the remainder rejected.” 23 Am.Jur.2d
 
 Dedication
 
 § 43 (2002) (footnotes omitted). This is so because “[t]he public is not compelled to assume the burdens imposed by accepting every part of the offered dedication.”
 
 Id.
 
 Several other jurisdictions agree with this conclusion. See, e.g.,
 
 Corbin v. Cherokee Realty Co.,
 
 229 S.C. 16, 25, 91 S.E.2d 542, 546 (1956) (“[The City of Florence] was not required to accept the offer of dedication in its entirety. Any street shown on said plat could be accepted in part and the remainder rejected. The public could not be compelled to assume the burdens imposed by accepting every part of the offered dedication.” (citations omitted));
 
 Home Real Estate Loan & Ins. Co. v. Town of Carolina Beach,
 
 216 N.C. 778, 788, 7 S.E.2d 13, 20 (1940) (explaining that “the board of aldermen, acting under the charter and pertinent laws, has the discretionary power as to the extent to which the street as dedicated to public use will be accepted, and may thereby limit the responsibility of the town for maintenance”); and
 
 Moore v. City of Chicago,
 
 261 Ill. 56,
 
 *675
 
 59, 103 N.E. 583, 584 (1913) (“The law is well settled that, when a person plats property into a subdivision and maps out streets thereon, the authorities may accept them in whole or in part. The public is not compelled to assume the burdens imposed by accepting every part of an offered dedication. An acceptance of a part is not an acceptance of the whole....”).
 

 Chalkley counters that “public policy” and common sense require the County assume responsibility for the whole storm-drainage system because that is the only way it can effectively manage and operate the system. The entire system is necessary for the storm drainage to operate properly, Chalkley argues, so the County cannot pick and choose which parts of the system to accept. Chalkley contends that
 
 Beachcroft Properties, LLP v. City of Alabaster,
 
 949 So.2d 899 (Ala.2006), confirms that public policy requires this result.
 

 Beachcroft
 
 concerned a dispute between the owners of two contiguous platted subdivisions in the City of Alabaster. Beach-croft Properties, LLP (“Beachcroft”), owned the Forest Highlands subdivision, and BW & MMC, LLC (“BW”), owned the Lake Forest subdivision. A sewer system was installed in Lake Forest in accordance with the preliminary plat approved by the City of Alabaster’s planning and zoning board (“the board”). The sewer system included a sewer line capable of serving both Lake Forest and Forest Highlands. When Beachcroft presented its preliminary plat for Forest Highlands to the board, it requested permission to connect sewer lines in its subdivision to the sewer line that was part of the sewer-system installation in Lake Forest. BW informed Beachcroft and the board that it would not allow Forest Highlands to connect to the Lake Forest sewer system, and the board stated that it did not believe it had the authority to force BW to let Forest Highlands connect to Lake Forest’s sewer system. When BW presented its final plat to the board, it dedicated the streets of the subdivision to the public, but it purported to specifically exempt from public dedication the sewer system running underneath those streets.
 

 Beachcroft filed a complaint against BW and Alabaster seeking a judgment declaring that the streets of Lake Forest and the sewer system that ran underneath them had been dedicated to the public, and, therefore, that BW could not prevent Forest Highlands from connecting the sewer lines in to the sewer system. It also sought an order enjoining BW from preventing Beachcroft from connecting the sewer lines in Forest Highlands to the sewer system. Subsequently, the board accepted the final plat for Lake Forest and the preliminary plat for Forest Highlands subject to the judicial resolution of the issue of control of the sewer system. The trial court entered a summary judgment in favor of BW and Alabaster, concluding that BW “ ‘lawfully withheld from dedicating the sanitary sewer’” and that “Alabaster properly approved a reservation to allow [BW’s] withholding from public dedication a portion of the subdivision.... ”
 
 Beachcroft Props., LLP v. City of Alabaster,
 
 901 So.2d 703, 706 (Ala.2004) (emphasis omitted).
 

 In the initial appeal, this Court concluded that the trial court, in finding that Alabaster had approved the reservation of the sewer system by BW, had failed to settle the dispositive issue of “whether a real-estate developer, in platting a subdivision for approval by a municipal planning board, may impose on the municipality an express reservation prohibiting the municipality from asserting control over the sewer lines beneath the platted streets or from effecting a sanitary-sewer connection between two adjoining subdivisions.” 901
 
 *676
 
 So.2d at 709-10. Accordingly, we remanded the case to the trial court for resolution of that issue. On remand, the trial court again entered a summary judgment in favor of BW and Alabaster.
 

 In the second appeal, Alabaster filed a brief agreeing with Beachcroft that the sewer system, like the streets of Lake Forest, is public property because it is connected to the city sewer system. See
 
 Beachcroft Props., LLP,
 
 949 So.2d at 902
 
 (“Beachcroft II”).
 
 It also agreed with Beachcroft’s contention that “ ‘[a] developer ... cannot ... determine what members of the public shall have access to public improvements to the exclusion of a municipality.’ ” 949 So.2d at 901-02. BW, on the other hand, contended that it owned the sewer lines and the pump station accompanying them and would own them until it chose to deed them to Alabaster.
 

 This Court reversed the judgment of the trial court, noting that
 

 “it is undisputed that the sewage from Lake Forest flows to facilities owned and operated by the City, and it is un-controverted that BW does not purport to own or treat the sewage discharged by Lake Forest. In other words, when the Lake Forest sewer system was connected to the City’s system, the City acquired the effluent, and the concomitant duty to dispose properly of the sewage flowing from Lake Forest to other points within the City’s system.
 

 “It must be, therefore, that the pipes under Lake Forest and the pump station on lot 599 have become an integral part of the public sewer system with the right of control consequently vested in the City. Were it otherwise, the developer of one subdivision could hold another development hostage on a whim, thereby improperly interfering with the orderly development of a municipality.”
 

 949 So.2d at 905-06 (footnote and emphasis omitted).
 

 Chalkley contends that
 
 Beachcroft II
 
 stands for the proposition that if the sewer system of a subdivision is connected to the public sewer system, then the developer has no right to reserve a portion of the sewer system. According to Chalkley, “[a]ll of the system must be dedicated to the government entity so that the government entity can properly manage and control the system.” Chalkle/s brief, p. 21. Chalkley then insists that the converse must also be true, i.e., “that the government entity cannot pick and choose which portions of the system to accept, when all of the system is absolutely necessary for its proper operation.”
 
 Id.
 

 This argument fails to recognize the distinction between dedication and acceptance.
 
 Beachcroft II
 
 simply reinforces the rule that “[a] condition or limitation which would render the dedication ineffectual cannot be annexed.... Nor can there be a valid dedication to a part only of the public, since this would be repugnant to the purpose of the dedication....”
 
 Greil,
 
 201 Ala. at 306, 78 So. at 82 (quoting 1 Elliott,
 
 Roads & Streets
 
 § 163). In other words, the system in question could not be partly dedicated to the public because otherwise the public system is at the whim of private control.
 

 Whether the public must accept the entirety of a dedication of property to public use is another matter. Chalkley is essentially arguing that the public can be forced by a private donor’s dedication to accept responsibility for property the government entity does not wish to assume. As the trial court here correctly observed, in
 
 Beachcroft II
 
 the government entity, Alabaster, claimed responsibility and control over the sewer system. In this case, however, the County specifically disclaimed responsibility for those portions of the
 
 *677
 
 storm-drainage system that run underneath private property in the subdivision. The developer in this case did not restrict its dedication and therefore did not interfere with the County’s control over development of the subdivision. Instead, the County exercised its control by electing to accept only part of the developer’s dedication. Nothing in our law prevents such a partial acceptance, and we will not rewrite the law to impose an obligation upon the County that it does not wish to accept. See
 
 Ivey,
 
 190 Ala. at 204-05, 67 So. at 509.
 

 Based on the foregoing, the judgment of the trial court against Chalkley and in favor of the Commission is affirmed.
 

 AFFIRMED.
 

 COBB, C.J., and LYONS, WOODALL, STUART, SMITH, BOLIN, and SHAW, JJ., concur.
 

 PARKER, J., concurs in the result.
 

 [1]
 

 . Chalkley does not contend that the County need not accept the dedication of the easement in question in order to have responsibility for its maintenance.
 

 [2]
 

 . The land in question in
 
 Ivey
 
 was the subject of a dedication that occurred by means of the public recording of a plat before the annexation of the property into the City of Birmingham. Although not cited in the opinion, the statute applicable to such dedication read as follows:
 

 "The acknowledgment and recording of such plot shall be held in law and equity to be a conveyance, in fee simple, of such portion of the premises plotted as one marked or noted on such plot as donated or granted to the public, and the premises intended for any street, alleyway, common or other public use, as shown in said plot shall be held in that trust for the uses and purposes intended or set forth in said plot."
 

 Act No. 52, § 3, p. 93, Ala. Acts 1886-87.
 

 [3]
 

 . In
 
 Harper v. Coats,
 
 988 So.2d 501, 508 (Ala.2008), this Court considered a dispute between individuals, who were adjacent landowners;
 
 Harper
 
 did not involve the obligation of either a municipal corporation or a county to take responsibility for the maintenance of dedicated property without first having accepted the dedication. It was in this context that the
 
 Harper
 
 Court held that “[rjoads in a subdivision located outside the city limits or police jurisdiction of a municipality are deemed dedicated to the public by way of proper recordation of a plat, with no requirement of acceptance by any county governing
 
 *674
 
 authority.”
 
 Harper
 
 did not discuss or purport to overrule
 
 Tuxedo Homes.
 
 In
 
 Tuxedo Homes,
 
 the Court concluded that "the mere approval of the plat or map” by a city engineer "is not an acceptance of the proffered dedication and imposes no burden on the city” because such approval "does not invoke a discretionary act of the city commission.” 258 Ala. at 499, 63 So.2d at 816. The principle underlying the holding in
 
 Tuxedo Homes
 
 was that the ministerial function of a city or county engineer in approving a plat cannot "bind the city [or county] to maintain such streets” or other portions of the plat dedicated to the public. 258 Ala. at 498, 63 So.2d at 814.
 

 [4]
 

 . Chalkley does not argue that the Commission accepted the entire storm-drainage system by way of a public use of that system for a certain period or by other act by which acceptance might be deemed to have occurred implicitly or by estoppel.